UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Winter Moore

    v.                                              Civil No. 09-cv-329-SM

Mark J. Rockwood and Southern
New Hampshire Medical Center


**O R D E R**

Plaintiff has sued Mark Rockwood and Southern New Hampshire Medical Center ("SNHMC" or "the Hospital") in twelve counts, alleging that while she was a patient at the Hospital, she was assaulted by Rockwood, who was employed by the Hospital as a phlebotomist.  Before the court is Moore's motion to compel the Hospital to answer certain interrogatories and produce certain documents.  The Hospital objects, citing New Hampshire's quality assurance privilege, N.H. Rev. Stat. Ann. ("RSA") § 151:13-a.  The court held a hearing on Moore's motion on March 10, 2011.  For the reasons given, Moore's motion to compel is granted in part and denied in part.

**Background**

As described in Moore's complaint, the factual background is as follows.  Moore was admitted to the Hospital with severe

colitis.  The evening of her second day in the Hospital, February 12, 2007, Rockwood entered Moore's room without identifying himself, and he did not respond to Moore's request that he do so.  He did say, however, that he intended to perform a pelvic examination.  Rockwood then pulled Moore's blanket below her waist and poked and pressed her stomach and pelvis. On at least three occasions, he squeezed, rubbed, or otherwise touched Moore's breasts.  Ultimately, Rockwood also drew her blood.

     Shortly after the incident, Moore reported it to a Hospital nurse.  Moore also contacted her sister, who telephoned the Hospital's floor coordinator.  The floor coordinator, in turn, said she would report the incident to the Hospital's administration.  Several hours after the incident, Moore reported it to the Nashua Police Department.  In addition, during the night of the incident, Moore asked Hospital staff members, on several occasions, whether the phlebotomist who drew her blood was still in the hospital, and the nurses Moore spoke with refused to answer her questions and refused to disclose Rockwood's identity to her.

**Discussion**

As noted, Moore has asserted twelve claims against Rockwood and the Hospital.[1] Discovery is currently underway. Moore has made various discovery requests, several of which have been rebuffed by the Hospital. See Pl.'s Mot. to Compel, Exs. A (recitation of discovery requests) & B (Hospital's privilege log).

Moore has directed both interrogatories and requests for the production of documents to the following areas of inquiry:

> A. Risk assessments of the hospital concerning patient safety and security by SNHMC or third parties.
>
> B. Prior complaints about patient security.
>
> C. Written statements about the incident.
>
> D. Audits or reports regarding patient security at SNHMC by third parties or the hospital.
>
> E. SNHMC's investigation of the incident.
>
> F. Correspondence about the incident between SNHMC and its insurer(s).
>
> G. Correspondence about the incident between SNHMC and government agencies.

---

[1] Specifically, Moore claims that the Hospital violated Title XVIII of the Social Security Act and 42 CFR § 482.13 (Count I) as well as RSA 151:21 (Count II). She also claims that the hospital is vicariously liable for negligence (Count V), and directly liable for negligence per se (Count III), negligence (Count IV), negligent supervision (Count VI), breach of contract (Count VII), promissory estoppel (Count VIII), equitable estoppel (Count IX), negligent infliction of emotional distress (Count X), and negligent misrepresentation (Count XII). Finally, Moore claims that Rockwood is liable for both negligent infliction of emotional distress (Count X) and intentional infliction of emotional distress (Count XI).

3

In response to the Hospital's assertion of the quality assurance privilege, see RSA 151:13-a, Moore asked the Hospital to produce eighteen documents it listed in its privilege log, seventeen of which she still seeks:

    1. Patient/Customer Service Memorandum #1214, #1215.

    2. Patient occurrence report, dated February 12, 2007.

    3. Handwritten notes regarding complaints by patient and communications with family and risk management, undated.

    4. Report dated February 12, 2010 and notes, undated, of Jack Thompson.

    5. Mark Rockwood's statement, undated.

    6. Communications from Dr. Avinash Punyapu, dated February 13, 2007.

    7. Patient/Customer Service Memoranda, dated February 12, 2007.

    8. Computer record of report by Ms. Moore, dated February 12, 2007.

    9. Computer record of notice by Joint Commission regarding Ms. Moore's filing of complaint, dated July 13, 2007.

    10. Patient/Customer Service Memorandum re call from friend of Ms. Moore, dated February 13, 2007.

    11. Patient Occurrence Report/handwritten notes re interactions with friend of Ms. Moore.

    12. Correspondence from Barbara Richards, dated April 30, 2007, and undated notes regarding phlebotomists involved in Ms. Moore's care.

    13. Occurrence Report and correspondence regarding communications with Ms. Moore, dated April 12, 2007 and April 23, 2007.

   14. Occurrence Report regarding call from Paula
   Patten, Adult Protective Services, dated April 23,
   2007.

   15. Draft response to Joint Commission and
   correspondence relating to same.

   16. Joint Commission Notice of Complaint and
   communications relating to same.

   17. Joint Commission Notice of No Further Action,
   dated September 14, 2007.[2]

In response, the Hospital restated its belief that all the documents Moore sought were protected from discovery by New Hampshire's quality assurance privilege.

The statutory provision on which the Hospital relies provides, in pertinent part:

   I. As used in this section "records" means
   records of interviews and all reports, statements,
   minutes, memoranda, charts, statistics, and other
   documentation generated during the activities of a
   quality assurance committee.  Records shall not mean
   original hospital medical records or other records
   kept relative to any patient in the course of the
   business of operating a hospital.

   II. Records of a hospital committee organized to
   evaluate matters relating to the care and treatment of
   patients or to reduce morbidity and mortality and
   testimony by hospital trustees, medical staff,
   employees, or other committee attendees relating to
   activities of the quality assurance committee shall be
   confidential and privileged and shall be protected
   from direct or indirect means of discovery, subpoena,
   or admission into evidence in any judicial or
   administrative proceeding.  However, information,
   documents, or records otherwise available from

---

[2] Wisely, Moore appears to have dropped her request for a document titled "QA Memorandum for the Record of the Grievance Subcommittee Meeting, dated February 28, 2007 and May 2, 2007."

5

> original sources are not to be construed as immune from discovery or use in any such civil or administrative action merely because they were presented to a quality assurance program, and any person who supplies information or testifies as part of a quality assurance program, or who is a member of a quality assurance program committee, may not be prevented from testifying as to matters within his or her knowledge, but such witness may not be asked about his or her testimony before such program, or opinions formed by him or her, as a result of committee participation.

RSA 151:13-a.

In the only New Hampshire Supreme Court opinion that substantively discusses the contours of RSA 151:13-a, the husband of a woman who had contracted herpes while in the hospital contacted the hospital's nurse epidemiologist, after his wife had been discharged, and pointed out several unsanitary conditions he thought may have been the source of his wife's infection. See In re "K", 132 N.H. 4, 6 (1989). At trial, the court ordered the defendant hospital to produce the nurse epidemiologist's report. Id. at 5. The Supreme Court reversed, holding that all of the documents generated during the course of the nurse epidemiologist's investigation were subject to the Quality Assurance privilege. See id. at 12-15. In so holding, however, the court explained

> [A] quality assurance committee's attention does not place its subject matter beyond the bounds of discovery or disclosure in the normal course; the privilege is confined to the records and testimony described in the statute. See N.H.S. JOUR. 1410-14 (1981). Thus, the ordinary record of a patient's treatment remains admissible as it always has been,

6

>even though a quality assurance committee may have studied that record and issued a report based on data culled from it.

Id. at 15.

There is no question that the medical records generated during K's hospital treatment would not have been protected by the privilege. But, once the hospital began to collect information in response to K's husband's expression of concern, all the documents it generated thereafter were subject to the privilege. In the more usual case, where, for example, a former patient brings a malpractice action, the plaintiff's treatment records are not protected by the privilege but any records generated by an internal inquiry into the patient's adverse outcome would be protected. Where, as here, the former patient's cause of action does not involve the quality of her medical care, it becomes less likely that there will be any non-privileged information akin to treatment records kept in the ordinary course. Rather, it is likely that the bulk of the documents generated by the defendant will be, like those in In re "K", subject to the privilege because they were created in response to a patient complaint, in the context of a retrospective quality assurance operation.

Turning to the case at hand, Moore argues that the quality assurance privilege does not apply to the documents she seeks because: (1) the privilege does not apply to records unrelated

7

to medical care; (2) even if the privilege does apply, some of the documents she seeks fall outside the scope of the privilege; and (3) her need for the information she seeks is compelling, and there are no available alternative sources for that information.  The Hospital contends that Moore misstates the relevant law and has not identified a legitimate need for the documents she seeks because: (1) she may obtain original-source discovery through depositions; (2) she already has all her medical records and other original-source discovery; (3) she has obtained significant discovery from Rockwood, including a deposition; and (4) she has access to the records generated by the Nashua Police Department's investigation of her allegations against Rockwood.  The court considers each of Moore's three arguments in turn.

**Application of the privilege to non-medical records**.  Moore first argues that the statutory quality assurance privilege simply does not apply to the material she seeks because the privilege is limited to records related to medical care and treatment.  The court does not agree. Had the legislature intended for the privilege to be limited in that way, it would have said as much in the statute.  It could have done so merely by inserting the word "medical" before the phrase "care and treatment of patients" in RSA 151:13-a, II, but it did not.  Moreover, while the legislature did not use the word "medical"

in the first sentence of RSA 151:13-a, II, to qualify the care and treatment records to which the privilege applies, it <u>did</u> use that word in the second sentence of RSA 151:13-a, I, which states that "[r]ecords shall not mean original hospital medical records or other records kept relative to any patient in the course of the business of operating a hospital."  Whereas a patient's charts, surgical notes, medication records, and the like, qualify as medical records beyond the reach of the privilege, it is difficult to characterize the material Moore seeks, all of which was generated as a result of her complaint about Rockwood, as records kept in the course of the business of operating a hospital.

While there is no need to delve any deeper, the legislature's decision not to limit the privilege to records concerning "medical care and treatment" would appear to be based on a recognition that hospitals provide their patients with a wide range of care that goes beyond the strictly medical, and that non-medical care, just like medical care, will benefit from the salutary benefits of the quality assurance process.  <u>See</u> <u>In re "K"</u>, 132 N.H. at 10 (describing privilege as "promoting a hospital's vigorous self-criticism by immunizing its process and products from discovery by a particular litigant") (citation omitted).  Here, for example, the documents appended to the affidavit of Dr. Stephanie Wolf-Rosenblum demonstrate that the

Hospital's Quality Assurance Program has a standing committee on safety, see Def.'s Obj., Ex. A, Attach. A-1 (doc. no. 84-3), at 9, and a Patient Safety Plan which identifies itself as "[a] component of the SNHMNC Quality Assurance Plan," id., Attach. A-2 (doc. no. 84-4), at 1. Thus, the Hospital subjects both its medical care and its non-medical care to the same type of quality assurance procedures.

Based on the statutory language, as reinforced by the record, the court concludes that documents related to patient security are not categorically excluded from the protection of the quality assurance privilege.

**Documents outside the scope of the privilege.** Moore next argues that even if the privilege does apply to non-medical records, some of the records she seeks fall outside the scope of the privilege. Specifically, she seeks factual records from original sources, and points out, correctly, that non-privileged documents do not become privileged simply because they are presented to a quality assurance committee. See In re "K", 132 N.H. at 14 (explaining that a quality assurance "committee was not meant to have a Midas touch; it cannot convert a treatment record into a privileged review committee record merely by taking it into consideration") (citation omitted). The records Moore calls "non-privileged factual documents" include: (1) her report of the incident; (2) Rockwood's written statement to a

10

Hospital security guard; (3) third-party assessments of patient security at the Hospital; and (4) correspondence between the Hospital and its insurer.  While the cases Moore relies on are not particularly persuasive,[3] she does raise several valid points regarding the scope of the privilege.  The court considers sequentially each of the four categories of evidence Moore identifies as being outside the scope of the privilege.

Moore's report of the incident may well have resulted in the generation of many documents that are protected by the privilege, but her own initial report of the incident falls outside the scope of the privilege.  RSA 151:13-a, I, defines the term "records" to include "statements . . . generated during the activities of a quality assurance committee" and that might well protect any statement Moore gave <u>after</u> the inception of a quality assurance investigation.  At the time Moore gave her <u>initial</u> report, however, there was no quality assurance activity taking place with regard to her, and so, necessarily, her initial report was not "generated during" any such activity.

Rockwood's written statement to a Hospital security guard, however, appears to have been generated during the course of

---

[3] Specifically, she cites a case involving a privilege statute that is fundamentally different from New Hampshire's statute, <u>see</u> <u>Cochran v. St. Paul Fire & Marine Ins. Co.</u>, 909 F. Supp. 641 (W.D. Ark. 1995), a case involving an injury to a visitor rather than a patient, <u>see</u> <u>Dunkin v. Silver Cross Hosp.</u>, 573 N.E.2d 848 (Ill. App. Ct. 1991), and a case involving the attorney-client privilege, <u>see</u> <u>Klonoski v. Mahlab</u>, 953 F. Supp. 425 (D.N.H. 1996).

11

...
...

Hospital's investigation of Moore's complaint. Given the relationship between the Hospital's Complaint and Grievance process and its Quality Assurance Program, see Def.'s Obj., Ex. 1, Attach. A-4 (document 84-6), at 2, 3, 5, Rockwood's written statement is protected by the privilege. See In re "K", 132 N.H. at 13-14 (treating acts of nurse epidemiologist as acts of a quality assurance committee even though committee did not actually meet and direct specific assignment to nurse epidemiologist).

The next category of evidence, third-party assessments of patient security at the Hospital, is also protected by the privilege. As the party asserting the privilege, the Hospital bears the burden of demonstrating its applicability. At the hearing, it did so. The only third-party assessments of which the hospital is aware are those made by the Joint Commission, which is an accreditation agency. Because the Joint Commission is engaged in what can only be characterized as quality assurance activity, and because its assessments are based in large measure on materials generated by the Hospital in the course of carrying out quality assurance activities, the court concludes that the third-party assessments of patient security at issue in this case, i.e., security assessments made by the

Joint Commission, are covered by the quality assurance privilege.[4]

Finally, it is not at all clear how correspondence between the Hospital and its insurer could be considered "documentation generated during the activities of a quality assurance committee." RSA 151:13-b, I. While there is surely a retrospective element to such communications, see In re "K", 132 N.H. at 10, it seems very unlikely that the Hospital corresponded with its insurance company "for the purposes of providing instruction and deriving standards to be applied in future cases," id. (citation omitted). Accordingly, the quality assurance privilege does not apply to the Hospital's correspondence with its insurer.

But, at the hearing, the Hospital further identified the communication at issue as being a letter from its attorney to its insurer. As such, that communication falls squarely within New Hampshire's lawyer-client privilege. See N.H. R. Ev. 502(b)(1). Thus, Moore is not entitled to the correspondence it seeks.

---

[4] While the court is aware of no New Hampshire Supreme Court opinion so holding, it would certainly appear that if a quality assurance committee cannot transform a non-privileged medical record into a privileged quality assurance record simply by considering it, the converse must also hold true: a third party cannot transform a privileged quality assurance record into a non-privileged record simply by considering it.

13

**Plaintiff's compelling need.** As a last resort, Moore turns to Harper v. Healthsource New Hampshire, Inc., 140 N.H. 770 (1996) for the proposition "that there are occasions in which even the most sacred of privileges must fall, such as when there is no available alternative source for the information and there is a 'compelling need for the information,'" id. at 779 (quoting McGranahan v. Dahar, 119 N.H. 758, 764 (1979); citing State v. Whittey, 134 N.H. 736, 739 (1991)). Moore's brief is not persuasive on this point. She argues that "[t]he requested information is necessary," but she does not indicate what information, in particular, she is referring to, nor does she link that information to her claims in this case. Such a generalized argument provides an inadequate basis for denying the Hospital the benefit of the statutory privilege.

## Conclusion

As noted above, Moore seeks seven categories of information, see page 3, A-G, and seventeen specific documents or groups of documents listed in the Hospital's privilege log, see pages 4-5. Based on the scope of the quality assurance privilege, as described above, Moore's motion to compel is granted in part and denied in part, as follows.

With regard to categories A and D, risk assessments, audits, and reports concerning patent safety are completely protected by the privilege, and third-party assessments, audits,

14

and reports are protected to the extent they were made by the Joint Commission. Risk assessments, audits, or reports that are entirely independent of the Hospital's quality assurance program would not be protected by the privilege, but at the hearing, the Hospital demonstrated that it has no knowledge of any such assessments, audits, or reports.

The information in category B, i.e., prior complaints about patient security, is not protected by the privilege, but Moore's entitlement to discovery within that category is limited to the initial complaints; any records generated during the course of investigating those complaints is privileged. The Hospital's remaining concerns shall be addressed by Moore's limiting its request to a reasonable time frame (i.e., within five years of the incident).

The information in categories C and E is protected by the privilege, with the exception of Moore's initial statement.

The information in category F is not protected by the quality assurance privilege but, instead, is protected by the attorney-client privilege.

Finally, the information in category G is protected to the extent it consists of quality assurance materials provided to the Joint Commission or to any other state accreditation committed or agency. Correspondence that does not involve the communication or transmission of quality assurance materials

15

and/or correspondence to government agencies not involved in quality assurance activity is not protected by the privilege, but, at the hearing, the Hospital demonstrated that it has no knowledge of any such correspondence.

Turning to the request for documents listed in the Hospital's privilege log, Moore is entitled to the record identified in request 9, as that appears to be a record from the Joint Commission in response to an inquiry from Moore about her complaint. Regarding request 16, she is entitled to any notice from the Joint Commission indicating that it had received notice of Moore's complaint from Moore herself. The other "communications" referred to in request 16 appear to have been generated during the course of quality assurance activities, and are, therefore, protected by the quality assurance privilege. Because all the other documents Moore seeks, other than request 15, were generated during the course of quality assurance activities, they, too, are protected by the quality assurance privilege. Request 15 is protected by the attorney-client privilege.

**SO ORDERED.**

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  March 11, 2011

cc: W. Kirk Abbott, Jr.
    Rose Marie Joly, Esq.
    Kevin M. O'Shea, Esq.
    Laura A. Otenti, Esq.
    Michael A. Pignatelli, Esq.
    Nancy J. Puleo, Esq.
    Rose Marie Joly, Esq.
    Rosanna Sattler, Esq.
    Gilbert F. Whittemore, Esq.